*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| *ZURICH INSURANCE COMPANY,* | ) |
| *et al.,* | ) |
| | ) |
| *Plaintiffs* | ) |
| | ) |
| *v.* | )          *Civil No. 08-325-P-H* |
| | ) |
| *SUNDAY RIVER SKIWAY* | ) |
| *CORPORATION,* | ) |
| | ) |
| *Defendant* | ) |

**RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT AND MEMORANDUM DECISION ON MOTIONS IN LIMINE**

The defendant has moved for summary judgment in this insurance coverage dispute, and the parties have moved *in limine* to exclude the testimony of certain potential expert witnesses.  I recommend that the court deny the motion for summary judgment, and I deny all but a portion of one of the motions *in limine.*

### I.  Motion for Summary Judgment

#### A.  Applicable Legal Standards

##### 1.  *Federal Rule of Civil Procedure 56*

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d

1

28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### 2. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's

2

statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1st Cir. 2008).

### B.  Factual Background

The following undisputed material facts are appropriately presented in the parties' respective statements of material facts submitted pursuant to Local Rule 56.

On December 8, 2002, Barbara Amburgey fell while skiing at Sunday River on skis and bindings Sunday River had purchased from Atomic Ski USA, Inc.   Defendant's Statement of Material Facts Not in Dispute ("Defendant's SMF") (Docket No. 37) ¶ 1; Plaintiff[s'] Opposing Statement of Material Facts ("Plaintiffs' Responsive SMF") (Docket No. 46) ¶ 1.  The skis and

bindings were provided to Amburgey on a "demo" basis. *Id.* She sustained a permanent spinal cord injury. *Id.*

Upon receiving the skis and bindings, Amburgey signed a form that included a release. *Id.* ¶ 2. The release stated, in relevant part:

> I hereby release, Hold Harmless and Indemnify . . . Sunday River Skiway Corporation . . . for any and all liability for personal injury including death and property damage in any way arising from the use of this equipment including but not limited to any alleged NEGLIGENCE on the part of the Releasees in the selection, installation, maintenance or adjustment to this equipment and its use.

*Id.* Amburgey understood when she signed the Release that she was entering into an agreement with Sunday River. *Id.* ¶ 3.

The bindings were provided to Amburgey to "demo" in connection with a potential purchase. Defendant's SMF ¶ 7.[1] Sunday River operates its retail store separately from its rental shop. *Id.* ¶ 8.[2] Sunday River did not offer Atomic bindings out of its rental shop in 2002. *Id.* ¶ 9.[3] Sunday River purchased Atomic bindings for its retail store, which permitted prospective purchasers to "demo" skis and bindings on a half-day or full-day basis, with the money paid for the demo to be credited toward the purchase. Defendant's SMF ¶ 10; Plaintiffs' Responsive SMF ¶ 10. Amburgey decided to demo the skis on December 8, 2002, because she wanted to see how they would perform before making a decision about purchasing them. Defendant's SMF

---

[1] The plaintiffs object to this paragraph of the defendant's statement of material facts and move to strike it as irrelevant, immaterial, and based on lack of personal knowledge. Plaintiffs' Responsive SMF ¶ 7. That objection is overruled and the motion is denied. Their purported alternative "qualification" of the paragraph does not address the factual substance of the paragraph, which is deemed admitted to the extent recited in the text because it is supported by the citation given to the summary judgment record.

[2] The plaintiffs object to this paragraph of the defendant's statement of material facts and move to strike it as irrelevant and immaterial. Plaintiffs' Responsive SMF ¶ 8. That objection is overruled and the motion is denied. Their purported "qualification" of the paragraph does not address the factual substance of the paragraph, which is deemed admitted because it is supported by the citation given to the summary judgment record.

[3] The plaintiffs object to this paragraph of the defendant's statement of material facts and move to strike it as irrelevant and immaterial. Plaintiffs' Responsive SMF ¶ 9. That objection is overruled and the motion is denied. Their purported "qualification" of the paragraph does not address the factual substance of the paragraph, which is deemed admitted because it is supported by the citation given to the summary judgment record.

¶ 11.[4]  Before the delivery of the bindings to Amburgey, an Atomic certified binding technician determined that the bindings were selected, mounted, and adjusted for Amburgey in accordance with the specifications and requirements set forth in the current Manual and ASTM standards. *Id*. ¶ 13.[5]  The Atomic certified binding technician completed and signed a workshop form in connection with Amburgey's use of the bindings.  *Id*. ¶ 14.[6]

An agreement entitled "Alpine Bindings Limited Indemnification Agreement" was in effect between Sunday River and Atomic as of December 8, 2002.  Defendant's SMF ¶ 4; Plaintiffs' Responsive SMF ¶ 4.   It provided, in relevant part:

> Atomic shall . . . indemnify the Dealer from all liability arising from any claims for personal injuries sustained by any retail customer of Dealer growing out of the use by the customer of Bindings sold or mounted or adjusted on the skis of such customer by the Dealer.

*Id*.  It also included the following language:

> 5.   Limitations and Exclusion of Liability.  Dealer acknowledges and agrees that Dealer is purchasing non-rental products for resale only and therefore Atomic makes no warranties, expressed or implied, including warranties of merchantability and fitness for a particular purpose, to dealer.   Atomic's warranty on the products purchased for resale is for the exclusive benefit of the ultimate consumer . . .

> 10.   Retail Sales and Rentals.  Dealer agrees that its authorization under the agreement is solely for retail sales through personal direct contact with the consumer (no sales through catalog or internet).  The Dealer will sell new Products only to retail customers and not to any person who Dealer knows or has reason to know is buying them for the purpose of resale or rental to another party.  Dealer acknowledges and agrees that the ski binding Products will be purchased by Dealer for retail sales only and not for general rental use.  The obligation of Atomic to indemnify Dealer described below shall not apply to any bindings used for general rental purposes . . ..

---

[4] The plaintiffs object to this paragraph of the defendant's statement of material facts and move to strike it on the grounds that it is irrelevant and immaterial.  Plaintiffs' Responsive SMF ¶ 11.  The objection is overruled and the motion is denied.  In the alternative, the plaintiffs admit the paragraph.  *Id.*
[5] The plaintiffs' qualification of this paragraph of the defendant's statement of material facts, Plaintiffs' Responsive SMF ¶ 13, does not require any modification of the statement in the text.
[6] The plaintiffs' qualification of this paragraph of the defendant's statement of material facts, Plaintiff's Responsive SMF ¶ 14, does not require any modification of the statement in the text.

Indemnification Will Not Be Available If The Dealer:
A.  Made or permitted changes in the design of the Bindings and/or introduced non-Atomic parts into the Bindings;
B.  Failed to maintain the Bindings in a saleable condition because of improper storage, overuse, inadequate maintenance, or otherwise:
C.  Set the Bindings based upon false information relating to the customer, or
D.  Fails to maintain proper records as required by the Agreement and the Manual.

Plaintiffs' Statement of Additional Facts ("Plaintiffs' SMF") (included in Plaintiffs' Responsive SMF beginning at 9) ¶ 23; Defendant's Reply Statement of Material Facts ("Defendant's Responsive SMF") (Docket No. 51) ¶ 23.

In August 2006, Amburgey sued Atomic in connection with her accident.  Defendant's SMF ¶ 5; Plaintiffs' Responsive SMF ¶ 5.  Atomic paid money to Amburgey to settle that lawsuit.  *Id*. ¶ 6.  Sunday River gave Atomic timely notice in writing of Amburgey's accident and her potential personal injury claim.  *Id*. ¶ 15.  Sunday River cooperated fully with Atomic in the investigation, litigation, and settlement of Amburgey's claim.  *Id*. ¶ 17.

Amburgey's accident occurred on what was essentially her first run down the mountain.  Plaintiffs' SMF ¶ 21; Defendant's Responsive SMF ¶ 21.  She put on the skis at her condo, skied the short distance from her condo to a nearby ski lift, took the ski lift to the top of Barker Mountain, and skied down a short way to a stopping point halfway down that trail near another lift to talk to her husband.  *Id*.  Right after they started skiing again the accident happened.  *Id*.

## C.  Discussion

### 1.  The Amburgey Release

The defendant begins by arguing that Amburgey's release of the defendant bars any action by the plaintiffs against it.  Defendant's Motion for Summary Judgment ("Motion") (Docket No. 36) at 4.  It cites the Maine Law Court's statement in *Thermos Co. v. Spence*, 735

A.2d 484, 489 (Me. 1999), to the effect that "the determination of liability of one tortfeasor to another . . . turns on the relationship between the original injured party and the contribution defendant 'and not on any relationship between the parties to the contribution action."   But, Maine law[7] is not as simple as the defendant would have it.  This quoted language does not necessarily mean that once a potential tortfeasor has been released by the injured party, it can never be liable for contribution to another tortfeasor that also may have caused the injury.

At issue in *Thermos* was the right to a jury trial in a contribution action.  *Id.* at 485.  The language quoted above, upon which the defendant relies, is found in a paragraph that discusses "the controlling issues for adjudication in a contribution action."  *Id.* at 489.  It is offered by the Law Court as "[p]ut[ting] another way" the following sentence: "The adjudication of negligence, causation, and damages form[s] the foundation of a contribution action."  *Id.*  Clearly, this language does not refer to the question of whether a release signed by the injured party protects the releasee from an action for contribution as well.

The Law Court has addressed that question directly.  In *Otis Elevator Co. of Maine, Inc. v. F.W. Cunningham & Sons*, 454 A.2d 335 (Me. 1983), the Law Court held that a joint tortfeasor directly liable for the death of another is entitled to contribution from another joint tortfeasor whose negligence was also a proximate cause of the death but who was not legally liable under the comparative negligence statute in effect at the relevant time.  *Id.* at 336-37. Significantly, the court observed, "The fact that one of the tort-feasors has a personal defense if he were to be sued by the injured party would seem to be irrelevant."  *Id.* at 338.

Also in 1983, the Law Court said in *Emery Waterhouse Co. v. Lea*, 467 A.2d 986 (Me. 1983), discussing its holding in *Otis*, that "once an injured party has been paid his judgment by a joint tortfeasor directly liable to that party, considerations shift solely to concerns of what is fair

---

[7] The parties appear to agree that Maine law applies to their dispute.

between tortfeasors whose negligence collectively caused injury to another." *Id.* at 997 (citation and internal punctuation omitted).  It went on to conclude that "[t]he fundamental principle of freedom of contract requires recognition of the release provision vis-à-vis the parties to that contract[,]" but refused to enforce the provisions of a release between the injured party and one tortfeasor against another tortfeasor. *Id.*

This court will not blaze new trails in this area of Maine law. *See Ryan v. Royal Ins. Co.*, 916 F.2d 731, 744 (1st Cir. 1990).  The defendant is not entitled to summary judgment by virtue of its release contract with Amburgey.

### 2. *Atomic as Tortfeasor*

The defendant argues for the first time in its reply memorandum that a contribution claim is unavailable to Atomic and to its subrogee, Zurich, as a matter of law because "[t]hey declare that Atomic bears no responsibility whatsoever for Ms. Amburgey's accident."  Defendant's Reply to Plaintiffs' Objection to Defendant's Motion for Summary Judgment ("Reply") (Docket No. 50) at 1.  Even if this contention were properly before this court, which it is not, *see, e.g., Warming v. Harford Life & Acc. Ins. Co.*, __ F.Supp.2d ___, 2009 WL 2778396 (D. Me. Aug. 30, 2009), at *8 n.8, I would reject it.  The defendant cites page 14 of the plaintiffs' Opposition as the place where Atomic purportedly makes such an assertion, Reply at 1, but that is a mischaracterization of Atomic's position, which is merely that it was strictly liable to Amburgey under Maine law even though it believed itself to be without fault.  Plaintiffs' Objection and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Opposition") (Docket No. 45) at 14.  Nor must paragraph 19 of the plaintiffs' responsive statement of material facts, also cited in this regard by the defendant, Reply at 1-2, be read to assert that Atomic itself bears no liability for Amburgey's injuries.  The paragraph merely states

the basis of the plaintiffs' claim that the defendant bears liability for those injuries.   The plaintiffs would not be bringing a contribution action if they had not already performed some act consistent with Atomic's liability, however determined, for Amburgey's injuries.

### 3.  Atomic's Indemnification

In the alternative, the defendant contends that the "Alpine Bindings Limited Indemnification Agreement" bars the plaintiffs' contribution action.  Motion at 9-11.  It asserts that "[t]he preconditions to Atomic's indemnification obligation set forth in the Indemnification Agreement have been met[,]" *id*. at 10, and the plaintiffs do not disagree with that.  Opposition at 15-20.   The parties differ about the applicability of the indemnification language in three respects: whether Amburgey's use of the bindings was "general rental use," which is excluded from the indemnity; whether the defendant itself was negligent in a way that bars it from recovering under the indemnity agreement; and whether the defendant added non-Atomic parts to the bindings at issue.  *Id.*

### a.  General rental use.

The language of the indemnification agreement that is at issue here is the following: "The obligation of Atomic to indemnify Dealer described below shall not apply to any bindings used for general rental purposes."  Plaintiffs' SMF ¶ 23, Defendant's Responsive SMF ¶ 23.  The indemnification agreement apparently does not define the term "general rental purposes."

The plaintiffs interpret this language to mean that "[t]he agreement is not intended to apply to rentals," Opposition at 16, and that the bindings at issue were part of what it dubs "Sunday River's 'demo fleet,'" *id*. at 17, which were rented to Amburgey at the time of the accident.  *Id*. at 17-18.  Thus, they posit, "when the ultimate end user is renting the equipment –

for whatever reason – the agreement does not apply." *Id*. at 18.[8]  As evidence, they offer the fact that Amburgey "filled out the standard rental equipment form with Sunday River . . . the form Sunday River used for all rentals." *Id*. at 18-19.

The plaintiffs' first problem with this argument is that all of the evidence they cite in support of it, *id*. at 19, is presented only in their purported qualifications of various paragraphs of the defendant's statement of material facts.  The only exception, a citation to paragraph 31 of their own statement of material facts, *id*., merely establishes that Amburgey testified at deposition that she "agreed to one day's use of a pair of Atomic SX-11 skis on a 'demo' basis" and that she "wanted to see how they would perform before making a decision about whether to purchase a pair of those skis."  Plaintiffs' SMF ¶ 31.  Neither statement establishes that Amburgey was renting the skis and bindings or that she filled out any form.  The remaining citations to the record cannot be considered because facts on which the party opposing a motion for summary judgment relies must be presented in that party's own statement of material facts, not merely in the responses to the moving party's statement of material facts, to which the moving party has no opportunity to respond.  *See, e.g., Brennan v. Casco Bay Island Transit Dist*., No. 07-138-P-H, 2009 WL 1307875 (D. Me. May 11, 2009), at *7 n.4; *Citizens for Squirrel Point v. Squirrel Point Assocs*., No. 03-193-P-H, 2005 WL 81614 (D. Me. Jan. 13, 2005), at *11 n.16.  The defendant has appropriately objected to such use of the plaintiffs' responses.  Defendant's Responsive SMF at 1.

This oversight may have little practical effect, however, both because the agreement Amburgey signed has been made part of the summary judgment record by the defendant itself, *see* Exhibit B to Affidavit of Jeff Rosenberg (Docket No. 38), and because, even if the facts at

---

[8] The plaintiffs also argue that the bindings at issue must have been in use for rental purposes because the model at issue "was a more popular binding model for rental purposes."  Opposition at 18.  That fact has little bearing on the question of how the bindings were actually being used at the relevant time.

issue were accepted as true for purposes of the motion, all that is established thereby is that Amburgey may have been "renting" the bindings at the time of her accident, and she effected that rental by signing a form used by the defendant for all of its equipment rentals.  Those facts do not and cannot establish that the bindings involved were being used by Sunday River for *general* rental purposes, but only for one *specific* purpose that, depending on the customer, may or may not have ultimately constituted a "rental."

The plaintiffs cannot avoid the application of the indemnification agreement on this basis.

*b.  The defendant's own negligence.*

The plaintiffs argue vigorously that common law prevents the defendant from invoking the benefit of the indemnification agreement in this case because indemnification agreements must be construed to prevent "recovery by an indemnitee for his own negligence."  Opposition at 15-16.  But, the defendant in this case is not looking to the indemnification agreement in order to *recover* for its own negligence.  Assuming that the plaintiffs mean to refer to the defendant's effort to *prevent* them from recovering from the defendant, neither Atomic nor the defendant has yet been determined to have been without negligence in this case.

Under Maine law, a party may not invoke indemnity to relieve itself from liability for its own negligence unless the indemnification document

> clearly and unequivocally reflects a mutual intention on the part of the parties to provide indemnity for loss caused by negligence of the party to be indemnified that liability for such damages will be fastened on the indemnitor, and words of general import will not be read as expressing such an intent and establishing by inference such liability.

*Emery Waterhouse*, 467 A.2d at 993.  The language at issue here provides:

> Atomic shall . . . indemnify the Dealer from all liability arising from any claim for personal injuries sustained by any retail customer of Dealer growing out of the use by the customer of Bindings sold or mounted or adjusted on the skis of such customer by the Dealer.

11

Defendant's SMF ¶ 4; Plaintiffs' Responsive SMF ¶ 4.  The Maine Law Court found that similar language in the lease at issue in *Emery Waterhouse* did not "indicate[] or compel[] the inference that the parties meant to include damage from the indemnitee's own negligence" and refused to enforce the indemnity clause in favor of a party that had been found to be negligent in the underlying circumstances.  467 A.2d at 993.  *See also Doyle v. Bowdoin College*, 403 A.2d 1206, 1208-09 (Me. 1979).

This construction of the indemnification language may appear to render the clause of little or no value, but it is nonetheless Maine law.  Because the indemnification clause may not come into play, depending on whether the defendant is found to have been negligent in connection with Amburgey's injuries, the defendant is not entitled to summary judgment based on the indemnification agreement.

### c. Use of non-Atomic parts.

The same outcome is required with respect to the plaintiffs' third argument based on the indemnification agreement, one to which the defendant does not respond.  The indemnification agreement provides that indemnification will not be available if the defendant "introduced non-Atomic parts into the Bindings."  Plaintiffs' SMF ¶ 23; Defendant's Responsive  SMF ¶ 23.  Specifically, the plaintiffs contend that the defendant used "the wrong screws" to install the bindings, thereby "critically impact[ing] the bindings' performance."  Opposition at 15.  This argument is based on paragraphs 24-26 of the plaintiffs' statement of material facts.  *Id*. at 19.

Those paragraphs provide as follows:

> 24.  On the accident skis and bindings, there are gold screws in rear screw holes of the mounting for the left binding, as opposed to the black screws that the Atomic binding manual specifies.  There were also gold screws in the toe piece of the left binding, and the Atomic manual calls for manufacturer-supplied white/silver screws.

25.  The plastic on the underside of the housing on the heel piece (of the "left ski") is noticeably scraped or "rubbed" by the incorrect wrong-sized screws used by Defendant's employees to mount the accident bindings to the accident skis.

26.  The overly long screws created a compromised binding system that was unable to react properly to the dynamic forces a binding system experiences during skiing.  The long screws do not allow the toe and heel bindings to move freely back and forth in the base tracks as designed.  This in turn resulted in poor performance when the ski goes from flex to counter-flex, and in addition the convex bulging at the base of the left ski, under the left toe binding, due to the overly long screws resulted in a ski that was laterally unstable.  Sunday River then made adjustment errors in setting the bindings that further compounded those problems which compromised the bindings system arising from the faulty mounting.

Plaintiffs' SMF ¶¶ 24-26 (citations omitted).  The defendant responds to these paragraphs by questioning the accuracy of the testimony cited in support.  Defendant's Responsive SMF ¶¶ 24-26.[9]  For purposes of summary judgment, it is enough that the evidence cited by the nonmoving party could reasonably be construed to support its argument.  The weight of the testimony, which is the basis of the defendant's response, can only be determined at trial.

For this reason as well, the defendant is not entitled to summary judgment on the basis of the indemnification agreement.

## II.  The Motions to Exclude Expert Testimony

The plaintiffs have moved to exclude the testimony of two expert witnesses identified by the defendant, Clyde Richard and Christopher Brown.  Docket Nos. 32 & 34.  The defendant has move to exclude the testimony of two expert witnesses identified by the plaintiffs, Andrew Cesati and Jaspar Shealy.  Docket No. 35.  I deny all but a portion of one of the motions.

---

[9] The defendant's motion to exclude the testimony of Dr. Shealy, on which paragraph 26 of the plaintiffs' statement of material facts is based, is denied *infra*.

## A.  The Plaintiffs' Motions

### 1.  Clyde Richard

The plaintiffs seek to exclude the testimony of Clyde Richard on the grounds that it lacks reliability.  Plaintiffs' Motion in Limine to Exclude Clyde Richard's Expert Testimony ("Richard Motion") (Docket No. 32) at 1.  Specifically, they contend that Dr. Richard "was completely unqualified to use the device from which he received the test results underlying his expert opinion."  *Id.* at 3.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, "it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis."  *Beaudette v. Louisville Ladder, Inc*., 462 F.3d 22, 25 (1st Cir. 2006).  With respect to reliability:

> In *Daubert,* the Supreme Court set forth four general guidelines for a trial judge to evaluate in considering whether expert testimony rests on an adequate foundation: (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline.  However, these factors do not constitute a definitive checklist or test, and the question of admissibility must be tied to the facts of a particular case.

*Id.* (citations and internal quotation marks omitted); *see also, e.g., Zachar v. Lee*, 363 F.3d 70, 76 (1st Cir. 2004) ("The court's assessment of reliability is flexible, but an expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was

consistent with standards of the expert's profession.") (citation and internal quotation marks omitted).

As the First Circuit has observed, "*Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) (citation and internal quotation marks omitted). "It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Id.* (citation and internal quotation marks omitted). That said, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (citation and internal quotation marks omitted).

Here, the plaintiffs assert that Dr. Richard's expert testimony "is based entirely on testing that he conducted in connection with this case," Richard Motion at 3, testing that was carried out by his assistants using a Vermont calibrated testing device that he rented from a local ski shop, *id.* at 4. Because Richard did not attempt to perform this testing in accordance with ASTM standards "applicable to testing ski equipment," refer to any technical manuals, or attempt to determine whether the device "was in proper testing shape," despite the fact that he had no training or experience in using this testing device, the plaintiffs contend, the results of his testing are unreliable. *Id.* at 4-5.

The defendant responds that Dr. Richard, a mechanical engineer, was qualified to test the effect of the screws used to attach the bindings at issue to Amburgey's skis with the Vermont

Calibrator at issue because the testing device "is simply a torque wrench," a tool that Dr. Richard has been using for over 40 years.  Defendant's Opposition to Plaintiffs' Motion in Limine to Exclude Clyde Richard's Expert Testimony ("Richard Opposition") (Docket No. 43) at 2-3.  Dr. Richard testified that the Vermont Calibrator "is a very simple device to use.  This is essentially a torque wrench."  Deposition of Clyde C. Richard, Exh. B to Richard Opposition, at 80.  The plaintiffs do not take issue with this description and have not filed any reply to the defendant's opposition to their motion.

The defendant goes on to point out that the plaintiffs do not suggest any way in which Dr. Richard's failure to conduct this testing in accordance with ASTM standards invalidates his results or makes those results inherently untrustworthy.  Richard Opposition at 4.  I agree; on the showing made, the plaintiffs' argument on this point goes to the weight of that testimony rather than its admissibility.  Nor was there any need for Dr. Richard to refer to any "technical manuals," assuming any such manuals exist for the Vermont Calibrator – a point the plaintiffs fail to mention.  An engineer who has used a torque wrench for 40 years would not need a technical manual to instruct him on its proper use.

Dr. Richard also addressed the question of whether the Vermont Calibrator "was in proper testing shape" at his deposition.  He said that there was only one moving part that might require calibration at some point, but he did check to make sure that the scale was free, the markers were moving properly, the strap cable was not damaged, the device fit together tightly, and there was no undue damage or wear.  Richard Deposition at 46-47, 50.

On the showing made, the motion to exclude Dr. Richard's testimony is denied.

16

## 2. *Christopher Brown*

The plaintiffs seek to exclude the expert testimony of Christopher A. Brown, Ph.D., arguing that it lacks the necessary reliability. Plaintiffs' Motion in Limine to Exclude Christopher Brown's Expert Testimony ("Brown Motion") (Docket No. 34) at 1. Specifically, they contend that Dr. Brown's testimony is based on "a construct that [Dr.] Brown himself invented," making it inherently unreliable, as it cannot be measured against any "objective standards." *Id*. at 5-6. They also assert that Dr. Brown's testing "cannot be demonstrated to be the product of 'reliable principles and methods'" and thus his testimony must be rejected. *Id*. at 6-7. Finally, the plaintiffs argue that Dr. Brown's testimony based on the testing apparatus he built "was created on behalf of Amburgey in connection with her litigation against Atomic," and must be excluded on that basis as well. *Id*. at 7.

The defendant responds that Dr. Brown, a professor of mechanical engineering at Worcester Polytechnic Institute, a technical reviewer for the International Society for Ski Safety, and an experienced skier himself, presented testimony other than the "work-to-release" theory that the plaintiffs challenge,[10] and, at a minimum, that testimony must be allowed. Defendant's Opposition to Plaintiffs' Motion in Limine to Exclude Christopher Brown's Expert Testimony ("Brown Opposition") (Docket No. 42) at 2-3. The plaintiffs do not respond to this argument, Plaintiffs' Reply Brief in Support of Motion in Limine to Exclude Christopher Brown's Expert

---

[10] Almost all of the plaintiffs' substantive argument, and indeed any reference to Dr. Brown's "work-to-release" theory, has been redacted from the public version of their motion. Docket No. 33. The only sealed document filed in support of the motion is a series of excerpts from the deposition of Dr. Brown taken in Amburgey's case against Atomic. Exh. 1 to Docket No. 34 (sealed). Yet the defendant's opposition to the motion was filed without any redaction (Docket No. 42), including an unredacted version of Dr. Brown's report, which discusses his "work-to-release" theory in detail (Exh. B to Docket No. 42). And the plaintiffs' reply memorandum (Docket No. 48) is not redacted, although it discusses the theory and cites directly to the deposition transcript. Under these circumstances, I conclude that any claim of confidentiality applicable to any document filed in connection with this motion to exclude has been waived.

Testimony ("Brown Reply") (Docket No. 48), and the motion will therefore be denied as to Dr. Brown's testimony based on anything other than his "work-to-release" theory.

With respect to the "work-to-release" theory, the plaintiffs first contend that it "fails all indicia of reliability."  Brown Motion at 3.  This is so, they assert, because "there exist ASTM approved tests used in the ski industry to test whether ski bindings are calibrated properly to prevent [inadvertent release,]" but Dr. Brown rejects those tests as "insufficiently designed" in favor of his own "work-to-release" theory of binding testing.  Motion at 4.  Because Dr. Brown invented this concept, they assert, without publishing any paper about it, accepting any standard against which to measure its efficacy, determining the acceptable minimal level measurement to meet his standard, or trying to determine whether the results of his testing in this case "were lower than a minimum value that a binding should have," any testimony about his theory or testing of the bindings at issue should be excluded.  *Id*. at 5.

With respect to the latter two alleged deficiencies, the defendant responds that determining an acceptable minimal level of measurement is not Dr. Brown's role, which is rather to offer an opinion as to the safety of Atomic's binding.  Brown Opposition at 5.  It contends that Dr. Brown can compare other ski bindings to Atomic's binding using his theory and methods, and that is what will help the factfinder understand the evidence, not whether there is some minimal level of performance that the theory requires a ski binding to meet.  It further asserts that publication by Dr. Brown concerning his technique "is not a *sine qua non* of admissibility," and that nothing prevents him from designing a case-specific test.  *Id*. at 6-8.

Reliability in this context is measured by the requirements of Fed. R. Evid 702, which

> requires that (1) the testimony be based upon sufficient facts or data, (2)
> the testimony be the product of reliable principles and methods, and (3)
> the witness have applied the principles and methods reliably to the facts
> of the case.  In undertaking this reliability review, an inquiring court may

> consider a wide array of factors, including but not limited to the
> verifiability of the of the expert's theory or technique, the error rate
> inherent therein, whether the theory or technique has been published
> and/or subjected to peer review, and its level of acceptance within the
> scientific community.  In the last analysis, the reliability inquiry must be
> flexible and case-specific.

*Santos v. Posadas de Puerto Rico Assocs., Inc.*, 452 F.3d 59, 64 (1st Cir. 2006) (citations and

internal punctuation omitted).  Here, the plaintiffs do not contend that Dr. Brown's testimony

was not based upon sufficient facts or data, or that he did not apply his method reliably to the

facts, nor have they challenged Dr. Brown's qualifications.  My analysis is, therefore, limited to

the second requirement listed in *Santos*.

 An expert's testimony need not be based upon industry standards to be admissible.  *See,

e.g., Lohmann & Rauscher, Inc. v. YKK (U.S.A.) Inc.*, 477 F.Supp.2d 1147, 1160 (D. Kan. 2007)

(use of standard not shown to be industry standard acceptable when chosen standard supported

by expert's reasonable explanation).  Nor is an expert required to have published his or her

method or theory.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993).  I reject the

plaintiffs' suggestion, unsupported by citation to authority, that the fact that a test is developed

by an expert for a specific case renders the results of that test inadmissible.  Brown Motion at 7.

The plaintiffs themselves, in fact, assert that "[a]ny device created for the sole purpose of aiding

one side in litigation should be looked upon with extreme skepticism[,]" *id*., a quintessential

expression of the proposition that the expert's use of such a device goes to the weight of his or

her testimony based on that use, rather than its admissibility.

 The plaintiffs argue that Dr. Brown's testing of the Atomic binding was not the product

of reliable principles and methods because he created a new device to test the bindings at issue.

*Id*. at 6-7.  The plaintiffs' position would be better served if they had offered expert testimony to

the effect that Dr. Brown's results from his use of this device could not be reliably replicated or

19

could never be compared to results from other existing tests commonly used to measure the same factor or factors.  Instead, they offer only conclusory assertions to the effect that the device "was created in such a manner as to make it impossible to determine the reliability of its results," *id.* at 7, a conclusion not supported by the portions of Dr. Brown's deposition testimony that they cite.  Similarly, the facts they set out do not support their conclusion that Dr. Brown's "work-to-release" theory "is not accepted in the ski industry."  Plaintiffs' Reply Brief in Support of Motion in Limine to Exclude Christopher Brown's Expert Testimony ("Brown Reply") (Docket No. 48) at 2.   The plaintiffs offer no evidence to support their assertion that the theory "has achieved no level of acceptance within the academic community," *id.*, apparently drawing this conclusion from the fact that Dr. Brown has not published an academic paper concerning the theory.  The fact that a theory has not been made known to the relevant academic community, at least by the traditional method of publication, does not and cannot mean that community has rejected it, as the plaintiffs' argument suggests.[11]

Of course, it is the defendant's burden to demonstrate that Dr. Brown's proposed testimony based on his use of his own testing device "has been arrived at in a scientifically sound and methodologically reliable fashion."  *Thorndike v. DaimlerChrysler Corp.*, 266 F.Supp.2d 172, 175 (D. Me. 2003)(citation omitted).  In this case, where no evidence of the verifiability of Dr. Brown's method or its inherent error rate, if any, has been proffered, the question presented is an extremely close one.  As was the case in *Santos*, 452 F.3d at 64, Dr. Brown worked directly

---

[11] Similarly, the plaintiffs' assertion that Dr. Brown "acknowledged" that the results of tests using his device "cannot be compared in any meaningful way with other testing machines that do conform to that standard," Brown Motion at 7, inaccurately characterizes his cited deposition testimony, which, to the extent of the excerpt provided by the plaintiffs, was as follows: "Q.  Would you expect test results that were obtained from, let's say a Vermont calibrator, to be different from the test results that you obtained for your report?  A.  They would have different values and – and their absolute values would be different.  I think their relative or comparative ranks that you would receive on the – or, find on the same set of bindings, would be similar."  [Excerpts from] Videotaped Deposition of Christopher A. Brown, Ph.D. ) Exh. 1 to Docket No. 34, at 30.  This testimony in fact suggests that such comparison is indeed possible.

with the bindings at issue, was aware of industry standards, made needed calculations, and relied on his extensive and relevant experience.  But, where "it is incumbent on the proponent to ensure that the record contains evidence explaining the methodology the expert employed to reach the challenged conclusion and why this methodology is a reasonably reliable one to employ[,]" *Thorndike*, 266 F.Supp.2d at 175, the court will not search through the case record to determine whether such evidence exists.  The defendant must point out such evidence, and in this case it has failed to do so.

Accordingly, the plaintiffs' motion to strike Dr. Brown's testimony is granted, but only as to testimony concerning the testing device he created, the results of that testing, and any other aspect of that testing.

### B.  The Defendant's Motion

The defendant has moved to exclude the testimony of two expert witnesses designated by the plaintiffs, Andrew Cesati and Jaspar Shealy.  Defendant's Motion in Limine to Exclude Expert Testimony of Andrew Cesati and Jaspar Shealy Pursuant to Federal Rule of Evidence 702 ("Defendant's Motion") (Docket No. 35).

### 1.  Andrew Cesati

The defendant contends that Andrew Cesati is not qualified to offer expert testimony and that his testimony will not assist the trier of fact.  *Id*. at 5-9.  Specifically, it first asserts that Cesati, with a degree in English literature and experience as a resort manager, who would be testifying as an expert for the first time, lacks the knowledge, skill, experience, training, or education to enable him to identify anomalies in Amburgey's skis and to conclude that these anomalies caused her accident.  *Id*. at 5-6.  It also assails Cesati's failure to perform any testing

of the skis or even to measure the variance he claimed to have observed, arguing that this means that Cesati used no scientific technique in reaching his conclusions. *Id.* at 6-9.

The plaintiffs respond that Cesati is qualified by experience to testify as an expert about Amburgey's skis: He began alpine skiing at age 2, was a competitive ski racer, worked as a ski racing coach, worked as the World Cup ski technician for the United States Men's Alpine National Ski Team and development/Europa Cup Team coach, and is currently head of the ski program at Crested Butte Academy. Plaintiffs' Opposition to Defendant's Motion in Limine to Exclude Testimony of Andrew Cesati and Jaspar Shealy ("Plaintiffs' Opposition") (Docket No. 44) at 4-5. He will testify that:

1.  the "forward pressure" and DIN settings[12] at the heel of each binding were too low for Amburgey;

2.  the tuning (or lack thereof) of the skis and the DIN settings in the bindings were inconsistent;

3.  the use of the incorrect screws (*i.e.*, screws that were too long and were not supplied by the manufacturer of the bindings for mounting the bindings) in the left binding inhibited the ability of that binding to move along the ski, created a space that should not have been present such that the boot did not sit flush against the ski, and cause a deformity in the shape at the base of the left ski; and

4.  these issues contributed to the accident.

*Id.* at 3.

---

[12] "DIN settings" are visual indicator release settings of ski bindings.  Plaintiffs' SMF ¶ 28; Defendant's Responsive SMF ¶ 28.

Experts may testify on the basis of experience, skill, and other knowledge. *Brown v. Wal-Mart Stores, Inc.*, 402 F.Supp.2d 303, 308 (D. Me 2005).  It is not necessary that a given expert have relevant academic credentials or training. *Small v. General Motors Corp*., Civil No. 05-131-P-H, 2006 WL 3332989 (D. Me. Nov. 15, 2006), at *14.  When reliability concerns focus upon personal knowledge or experience, a court may find a proposed expert's personal experience, training, method of observation, and deductive reasoning sufficiently reliable to constitute a "scientifically valid" methodology. *Id*. at *15 (denying motion to exclude testimony of expert based on many years of relevant experience and recent personal observation by experienced, knowledgeable witness).  Like the motor-vehicle engine builder proffered as an expert in *Small*, Cesati appears to have sufficient experience and expertise as a top-level ski technician to offer the foregoing listed opinions, and it is not necessary that those opinions be based on any particular "scientific method."

While it is true, as the defendant points out, that an expert who is relying primarily on his or her experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts[,]" Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion in Limine to Exclude Expert Testimony of Andrew Cesati and Jaspar Shealy ("Defendant's Reply") (Docket No. 47) at 3, citing *Brown*, 402 F.Supp.2d at 308, that was done in Cesati's written report.  Letter dated February 11, 2008, from Andrew W. Cesati to Peter DeTroy, Esquire (Attachment 1 to Docket No. 44) at [5].  If Cesati was asked to provide this explanation at his deposition and refused or was unable to do so, the burden is on the defendant to cite the page or pages of the deposition transcript where this occurred. *See Fullerton v. General Motors Corp.*, 408 F.Supp.2d 51, 55-56 (D. Me. 2006) ("From all that appears in the papers filed in connection with

this motion, Mizen was not asked at deposition about the methodology [he] used in reaching this conclusion.  His affidavit testimony is sufficient to overcome the defendant's argument; the defendant has not shown that an 'engineering basis' for the opinion is legally required, or indeed what an 'engineering basis' would be, as distinguished from the information Mizen has provided.") (footnote omitted).  The defendant has not done so in this case.

The remainder of the defendant's arguments with respect to Cesati go to the weight of his testimony rather than its admissibility.  The motion to exclude his testimony is denied.

### 2. Jaspar Shealy

The defendant contends that the proffered expert testimony of Jaspar Shealy will not assist the trier of fact to understand the evidence or to determine a fact in issue because he performed no tests and made no measurements in connection with his theory that the screws used to mount Amburgey's bindings adversely affected the bindings' flexibility.  Defendant's Motion at 9.  Essentially, the defendant contends that any expert testimony about the cause of Amburgey's accident may only be offered if the expert has made "a close examination of the bindings – which Mr. Shealy never performed."  *Id.* at 10.

The plaintiffs interpret this portion of the defendant's motion as seeking exclusion of only two particular, limited opinions expressed by Dr. Shealy: the use of the improper screws in mounting the bindings and that the left ski was not properly tuned.  Opposition at 12.  However, the defendant's presentation may reasonably be read to seek the exclusion of any testimony by Dr. Shealy.[13]  Dr. Shealy has a Ph.D. in engineering and "an extensive record of accepted articles in peer review publications on the specific topic of ski accidents[,]" as well as a history of

---

[13] With respect to the defendant's request that the court prohibit Shealy from testifying that Amburgey's left ski was improperly tuned because, in doing so, he would be relying on Cesati's expert opinion, Defendant's Motion at 10, it is clear that this request is based on an assumption that Cesati will not be allowed to testify.  Defendant's Reply at 6. I have denied the motion to exclude Cesati's testimony, so this argument is moot.

participating in the formulation of a series of ASTM standards "regarding skis, bindings and boots including, specifically, the release values of ski bindings." Plaintiffs' Opposition at 14. I see no reason why Dr. Shealy, any more than Cesati, should be required to perform some unspecified testing of Amburgey's equipment before being allowed to testify. Again, the defendant's argument, from all that appears, goes to the weight to be given his testimony rather than its admissibility.

The defendant's motion to exclude Dr. Shealy's expert testimony is denied.

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motion for summary judgment (Docket No. 36) be **DENIED**, and the defendant's motion to exclude (Docket No. 35) is **DENIED.** The plaintiffs' motion to exclude the testimony of Clyde Richard (Docket No. 32) is **DENIED.** The plaintiffs' motion to exclude the testimony of Christopher Brown (Docket No. 33) is **DENIED** in part and **GRANTED** in part, as set forth herein.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 15th day of April, 2010

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge